**CASE NO. 21-2328**

# IN THE
# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## FOR THE FOURTH CIRCUIT

---

ASHLEY NICOLE NOONAN,
f/k/a Ashley Culpepper

*Planitiff - Appellant,*

v.

CONSOLIDATED SHOE COMPANY, INC.

*Defendant - Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT LYNCHBURG

---

**RESPONSE BRIEF OF APPELLEE**

---

Monica T. Monday
Catherine J. Huff
GENTRY LOCKE
10 Franklin Rd., S.E.
P. O. Box 40013
Roanoke, VA 24022-0013
540-983-9300
monday@gentrylocke.com
huff@gentrylocke.com

*Counsel for Defendant - Appellee*

February 25, 2022

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477
A Division of Lantagne Duplicating Services

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _21-2328_    Caption: _Ashley Nicole Noonan v. Consolidated Shoe Company, Inc._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Consolidated Shoe Company, Inc._
(name of party/amicus)

_____

 who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?            ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?            ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?            ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature:  /s/ Monica T. Monday                          Date:          12/15/2021

Counsel for:  Consolidated Shoe Company, Inc.

Print to PDF for Filing

.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF THE ISSUES...........................................................1

    1.   Did the district court err in finding that Noonan failed to establish a prima facie case of intentional sex-based pay discrimination under Title VII?

    2.   Did the district court err in finding that Noonan failed to establish a prima facie case of retaliation under the Equal Pay Act and Title VII?

STATEMENT OF THE CASE...................................................................1

STATEMENT OF MATERIAL FACTS ................................................3

    A.   As the District Court Correctly Held, Noonan and Wiese Performed Different Jobs that Required Different Skills ............................3

    B.   CSC's Reduction in Force in the Fall of 2019 .............................5

    C.   Plaintiff and Wiese Both Requested Raises and Were Denied....................6

    D.   The Pay Disparity Complaint.......................................................7

    E.   CSC's Investigation ......................................................................8

    F.   CSC Did Not Retaliate Against Noonan.......................................9

    G.   Wiese and Noonan are Laid-Off in June 2020 ...........................10

    H.   After the Lay-Off, Noonan and Wiese Found New Positions ...................12

SUMMARY OF ARGUMENT ...............................................................12

ARGUMENT ...........................................................................................14

    I.   THE DISTRICT COURT PROPERLY GRANTED CSC SUMMARY JUDGMENT ON NOONAN'S TITLE VII CLAIM..................................14

        A.   STANDARD OF REVIEW ................................................14

B.    ARGUMENT ................................................................14

    1.    Noonan Abandons Her Reliance on Comparator Evidence And Does Not Challenge the District Court's Finding That Her Comparator Was Not Similarly-Situated .......................................14

    2.    There Is No Evidence Of Intentional Sex-Based Wage Discrimination ................................................................17

        a.    Noonan cites no authority that supports her claim that her pay disparity evidence satisfies her burden of establishing a prima facie case of sex-based pay discrimination .........................................................18

        b.    There is no other evidence of intentional discrimination ........22

        c.    The circumstances actually negate an inference of discrimination .......................................................25

    3.    If Noonan Stated A Prima Facie Case of Discrimination, CSC Rebutted It ............................................................26

II.    NOONAN FAILED TO STATE A PRIMA FACIE CASE OF RETALIATION UNDER THE EPA OR TITLE VII ................................29

  A.    STANDARD OF REVIEW ................................................29

  B.    ARGUMENT ................................................................29

    1.    Retaliation Claims Require A Specific Showing of Material Adversity; Trivial and Insubstantial Harms Are Not Sufficient .......................................................29

    2.    The Allegedly Retaliatory Acts Are Neither Material Nor Adverse ...............................................................30

        a.    Noonan suffered no material adversity as a result of Petrick's statement about discussing employees' salaries – a statement Noonan knew was incorrect and was promptly corrected by the HR Director ....................30

.

b.   There is no evidence that any change in Noonan's job responsibilities was material, adverse, or "because of" her complaint ...........................................................33

c.   Where Noonan declined CSC's offer of a neutral reference and said she did not need a reference, Christmas' decision not to serve as a reference was not a materially adverse action .........................................35

3.   If Noonan Stated A Prima Facie Case of Retaliation, CSC Rebutted it...............................................................39

REQUEST FOR ORAL ARGUMENT ..................................................40

CONCLUSION ............................................................................40

CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS........................................................................41

.

# TABLE OF AUTHORITIES

## CASES

*Adams v. Anne Arundel Cty. Pub. Schs.*,
789 F.3d 422 (4th Cir. 2015) .................................................................... 30

*Beall v. Abbott Labs.*,
130 F.3d 614 (4th Cir. 1997) ............................................................... 40, 41

*Boone v. Goldin*,
178 F.3d 253 (4th Cir. 1999) ............................................................... 30, 31

*Brown v. SDH Educ. East, LLC*,
2013 U.S. Dist. LEXIS 184746 (D.S.C. Dec. 13, 2013) ......................... 32

*Burlington N. & Santa Fe Ry. v. White*,
548 U.S. 53 (2006) ........................................................................ *passim*

*Chughtai v. Kaiser Permanente*,
2018 U.S. Dist. LEXIS 102848, 2018 WL 3049198 (D. Md. June 20, 2018) ........ 33

*Cooper v. Smithfield Packing Co.*,
724 Fed. Appx. 197 (4th Cir. 2018) ........................................................ 30

*County of Washington v. Gunther*,
452 U.S. 161 (1981) ........................................................... 18, 19, 20, 26

*Earl v. Norfolk State Univ.*,
2014 U.S. Dist. LEXIS 18583 (E.D. Va. Feb. 13, 2014) ......................... 22

*EEOC v. Cent. Wholesalers, Inc.*,
573 F.3d 167 (4th Cir. 2009) .................................................................. 14

*Gerner v. Cty. of Chesterfield*,
674 F.3d 264 (4th Cir. 2012) .................................................................. 15

*Hall v. Charlotte Mecklenburg School*,
2014 U.S. Dist. LEXIS 78801, 2014 WL 2586889 (W.D.N.C.
June 10, 2014) ........................................................................................ 39

.

*Harris v. Herring*,
2021 U.S. Dist. LEXIS 6457, 2021 WL 100651 (E.D. Va.
Jan. 12, 2021) ...............................................................................31

*Hernandez v. Johnson*,
514 Fed. Appx. 492 (5th Cir. 2013)...........................................32

*Hinton v. Virginia Union Univ.*,
185 F. Supp. 3d 807 (E.D. Va. 2016) .........................................33

*Honor v. Booz-Allen & Hamilton, Inc.*,
383 F.3d 180 (4th Cir. 2004) .....................................................14

*Humane Soc'y of the United States v. Nat'l Union Fire Ins. Co.*,
757 Fed. Appx. 270 (4th Cir. 2019)............................................16

*Jacobs v. N.C. Admin. Office of the Courts*,
780 F.3d 562 (4th Cir. 2015).....................................................14

*Jones v. Johanns*,
264 Fed. Appx. 463 (6th Cir. 2007).............................................32

*Laing v. Fed. Express Corp.*,
703 F.3d 713 (4th Cir. 2013).................................................15, 16

*Laurent-Workman v. McCarthy*,
2021 U.S. Dist. LEXIS 111411, 2021 WL 2426118 (E.D. Va.
June 11, 2021) .............................................................................26

*Ledbetter v. Goodyear Tire & Rubber Co.*,
550 U.S. 618 (2007).....................................................................23

*Lenzi v. Systemax, Inc.*,
944 F.3d 97 (2d Cir. 2019).............................................18, 19, 21

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973).....................................................................15

*McNeal v. Montgomery Cty.*,
307 Fed. Appx. 766 (4th Cir. 2009)....................................... 25-26

*Merritt v. Old Dominion Freight Line, Inc.*,
601 F.3d 289 (4th Cir. 2010).......................................................25

.

*Orgain v. City of Salisbury*,
305 Fed. Appx. 90 (4th Cir. 2008)...........................................................25

*Rivera v. Rochester Genesee Regional Transportation Authority*
743 F.3d 11 (2d Cir. 2012)......................................................................34

*Spencer v. Va. State Univ.*,
919 F.3d 199 (4th Cir. 2019).............................................15, 26, 27, 29

*Trahanas v. Northwest University*,
2020 U.S. Dist. LEXIS 241663, 2020 WL 7641293 (N.D. Ill.
Dec. 23, 2020) .................................................................................. 39-40

*United States v. Cohen*,
888 F.3d 667 (4th Cir. 2018).................................................................16

*Wernsing v. Dep't of Human Servs., State of Ill.*,
427 F.3d 466 (7th Cir. 2005).................................................................27

## CODES

29 U.S.C. § 206(d)(1).............................................................................19

## RULES

Fed. R. Civ. P. 56(a).............................................................................14

Appellee Consolidated Shoe Company, Inc. ("CSC") files its brief responding to the Opening Brief filed on behalf of Ashley Nicole Noonan ("Plaintiff" or "Noonan").

## STATEMENT OF THE ISSUES

1. Did the district court err in finding that Noonan failed to establish a prima facie case of intentional sex-based pay discrimination under Title VII?

2. Did the district court err in finding that Noonan failed to establish a prima facie case of retaliation under the Equal Pay Act and Title VII?

## STATEMENT OF THE CASE

Noonan's First Amended Complaint raised four counts: (1) violation of the Equal Pay Act ("EPA"); (2) retaliation under the EPA; (3) sex-based wage discrimination in violation of Title VII; and (4) retaliation under Title VII.

Noonan based her EPA and Title VII claims on male comparator evidence. She alleged that Matthew Wiese ("Wiese") was her "comparator." (JA 22, ¶110; 25, ¶141). With regard to her Title VII claim, she specifically alleged that Wiese was paid more than she was for performing similar work:

CSC discriminated against [Noonan] based on her sex when it paid a male employee significantly higher wages than [Noonan], and that male employee: performed substantially the same work as [Noonan], had essentially the same level of skill and responsibility as [Noonan], and worked under substantially the same conditions as [Noonan].

(JA 25, ¶141).

CSC denied the allegations. (JA 29). It also raised a number of affirmative defenses, including that Wiese was not a suitable comparator because his position was not substantially equivalent to Noonan's and their respective jobs did not require substantially equal skill, effort, and responsibility, (JA 44, ¶168-69), and that any pay disparity was based on a "factor other than sex." (JA 44, ¶167).

Following discovery, CSC moved for summary judgment on all four counts of the First Amended Complaint. On the EPA and Title VII claims, CSC's principal argument was that Wiese was not a proper male comparator because they were not performing similar jobs. (JA 48-9).

The district court granted CSC summary judgment. With regard to the EPA and Title VII claims, it held that Noonan "has failed to identify a better-paid male comparator who performed equal work (EPA) or who was similarly situated (Title VII) to her." (JA 1433). Specifically, the court held that "Wiese had a different role at Consolidated than Noonan." (*Id*.). As to the retaliation claims, the district court held that Noonan had failed to forecast evidence that any of CSC's actions were "materially adverse," a necessary element of a retaliation claim. It found that "[t]he actions that Noonan puts forward, even taken in the light most favorable to her, do not rise to the level of material adversity." (JA 1428).

Noonan did not ask the district court to reconsider its position; instead, she proceeded directly to this appeal.

2

Noonan does not appeal the dismissal of her EPA claim or the district court's finding that Wiese was not a proper male comparator under Title VII. Instead, she asserts that the district court failed to consider other evidence demonstrating that CSC intentionally discriminated against her. Thus, Noonan has now taken a position that is inconsistent with the central theory set forth in her First Amended Complaint.

## STATEMENT OF MATERIAL FACTS

Noonan's recitation of the summary judgment record does not include a discussion of the undisputed facts, which are recited here.

A. <u>As the District Court Correctly Held, Noonan and Wiese Performed Different Jobs that Required Different Skills.</u>

Noonan claimed that Wiese, a graphic designer, performed the same work that she did, but was paid more. In light of Noonan's male comparator allegations, the central issue in this case was whether Wiese was a better-paid male comparator who performed equal work (EPA) and was similarly situated (Title VII) to Noonan. The district court answered both questions in the negative, (JA 1433), and Noonan does not appeal that that finding. Given the importance of the comparator evidence below, it is briefly summarized here.

Noonan has a degree in communications and print journalism. (JA 99). She does not have a degree in graphic design. (JA 99, 206, 215). Prior to joining CSC, Noonan never held a job as a graphic designer. (JA 99). Cheryl Valentine

("Valentine") hired Noonan in February 2016 as Content Marketing Coordinator. (JA 228, 253-54). Noonan's salary was $39,000 during her employment at CSC. (JA 250-51, 609).

In 2018, CSC began an extensive search for a senior graphic designer. (JA 127). After negotiations, Kristina Petrick ("Petrick"), who now headed the marketing department, hired Wiese to fill that position in October 2018 at a salary of $68,000. (JA 800, 899-900, 1042-43)**.** Unlike Noonan, Wiese has a degree in graphic design, and all of his prior work experience was as a graphic designer. (JA 102).

After Wiese was hired, Petrick sent an email to a co-worker (not in management) in the finance department requesting raises for the members of her marketing team. As support for the raises, Petrick did some internet research to find a benchmark for higher salaries. Petrick admitted that industry standards she provided in the email were not accurate and were simply an attempt to secure raises for her department. (JA 830-35, 838). Further, the job titles in the email were not correct as Noonan was not a "Photographer." *Id.*

Noonan's and Wiese's qualifications and experience prior to working at CSC were different. (JA 1405-6). Further, Noonan's job as Content Marketing Coordinator and Senior Photographer and PR Specialist, and Wiese's job as Senior Graphic Designer were different, as shown in this side-by-side analysis of their respective duties:

| Content Marketing Coordinator; Senior Photographer and PR Specialist | Senior Graphic Designer |
|---|---|
| <ul><li>Create fashion blogs and on-brand product descriptions,</li><li>Creative writing, beautiful graphic design and strong imagery,</li><li>E-commerce site updates,</li><li>Coordinating and executing photography,</li><li>Coordinating marketing tactics,</li><li>Campaign messaging and visual design,</li><li>Campaign photography and video,</li><li>Content Development,</li><li>Manage influencer marketing,</li><li>Simple graphic-related tasks,<ul><li>Created jpeg images with prices using existing graphics</li><li>Used templates designed by others</li></ul></li><li>Search engine optimization,</li><li>Coordinated calendars,</li><li>Writing,</li><li>Email blasts</li></ul> | <ul><li>Maintained email graphics,</li><li>Created new templates for all branding,</li><li>Created templates and graphics from scratch,</li><li>Worked on website theme,</li><li>Tested website designs on different browsers and platforms, implemented on live website,</li><li>Optimized and configured printer,</li><li>Designed website, emails, ads, lookbooks,</li><li>Reshot some photography for use in his graphic design projects,</li></ul> |

(JA 91, 95-7, 118, 126-27, 157, 802-06, 808, 816-21, 861, 888).

B. <u>CSC's Reduction in Force in the Fall of 2019.</u>

CSC experienced financial difficulties in late 2019 and continues to experience them now, largely due to tariffs. (JA 1220). As a result, CSC instituted lay-offs in the fall of 2019, (JA 416-17), which included Valentine and McDade, two members of the marketing team. (JA 84, 860). Following the lay-offs, Noonan assumed some of McDade's responsibilities, including the remainder of the writing;

Petrick also took some of McDade's duties, and some were dissolved. (JA 860-61). Thereafter, only Petrick, Noonan, and Wiese remained in the marketing department.

Petrick supervised Noonan and Wiese. Noonan liked Petrick, and thought that she was supportive and a good teacher. (JA 290).

C. Plaintiff and Wiese Both Requested Raises and Were Denied.

Noonan requested raises during every performance review, as did Petrick. (JA 784-85). CSC saw nothing wrong with this practice – in fact, it was encouraged. (JA 785, 1248). Even if it did not have the budget to provide the requested raise, CSC could evaluate the employee's request if and when the money became available. (JA 694, 1248).

Consistent with her practice, Noonan requested a raise in December 2018. (JA 378-80). CSC did not grant her request, but Petrick offered to change Noonan's job title to help build her resume. (JA 378-80, 903-04). After some discussion, the title of "senior photography" and "PR specialist" was agreed upon—both new job titles for CSC for which no job description previously existed. (JA 130, 148, 903-04, 939). Accordingly, a job description was created to describe the new combined titles. (JA 157).

In early 2020, Wiese requested a raise, and his request was also denied. (JA 123, 715). At that time, Wiese's wife was expecting a baby and CSC worked with Wiese to provide some paid time off in the form of paternity leave. (JA 74, 716).

6

Neither Noonan nor Wiese received a raise during their employment with CSC.

     D. <u>The Pay Disparity Complaint.</u>

In December 2019, Noonan and Petrick met for Noonan's end-of-year performance review. Immediately after the review, Noonan told Petrick that she had learned a male employee's salary was higher than hers and she felt she was being discriminated against based on her gender because of the pay difference.[1] (JA 909-11). Petrick asked Noonan if money was the most important thing to her. (JA 504-05).

Petrick *incorrectly* told Noonan that whoever told her the pay information could be fired. (JA 131, 911-12: "Obviously I was mistaken."). Noonan remembered the conversation differently, testifying that Petrick told her that discussing employee compensation was a fireable offense. (JA 421). Noonan knew Petrick's statement was untrue at the time it was made, responding, "no, it's not." (JA 187, 421). Nevertheless, Noonan spoke with HR Director Melanie Christmas ("Christmas"), who corrected Petrick and confirmed that Noonan could not be fired for discussing pay. (JA 614-15). Indeed, CSC's handbook did not state that knowing another employee's salary was a fireable offense. (JA 1325).

---

[1] According to Noonan, a co-worker mysteriously found all of CSC's employees' paystubs, including Wiese's paystub, "in the warehouse," took a picture of them, and showed them to Noonan. (JA 338-40).

Noonan was not terminated or disciplined in any way for discussing her pay, and CSC took no adverse action against her. (JA 131, 422, 755-56). Petrick even corrected and apologized for the inaccurate statement. (JA 131, 615).

Petrick was shocked by Noonan's allegation that paying Wiese more was discriminatory "because [their] roles are so different." She notified CEO Camm Knight (a woman) of the complaint. (JA 131, 911-15).

After speaking with Petrick and consulting with an attorney, Noonan emailed Knight, (JA 115, 416-17, 423-24), and visited Christmas to inform her of the complaint.[2] (JA 613-14). Knight contacted Noonan to discuss Noonan's concerns, and to tell her she took the complaint very seriously – as CEO and as a woman – and would follow up on the complaint. (JA 115, 702, 724, 913). Knight opened an internal investigation into Noonan's complaint. (JA 115, 702, 913).

E.     CSC's Investigation.

CSC took Noonan's complaint seriously. (JA 115, 724, 913). Knight, Christmas, and Petrick did extensive research and spent hours looking at and comparing the projects and workloads of Noonan and Wiese. (JA 131-32, 702, 913-16). Knight reviewed Christmas' notes from Noonan's hiring as well as her work

---

[2] The only reason Noonan believes Wiese could be paid more than her is because of her gender. She was not familiar with how Wiese created graphics or what procedures and processes he used, and did not know whether he had more skill regarding use of advanced techniques. (JA 414-15).

experience and prior salaries. (JA 696). Christmas collected documents, and Petrick evaluated specific job duties, performance, and productivity. (JA 620-22, 702-05, 913, 925-26). They considered experience level, and tried to be very granular in evaluating Wiese and Noonan's respective roles and responsibilities. (JA 717-18, 961).

The investigation took several weeks. Knight, Christmas and Petrick[3] met several times as part of the investigative process. (JA 636, 961-62). Based upon the investigation, CSC concluded the pay differential was based on different job duties, experience, and skills of Noonan and Wiese, not gender. (JA 132, 634, 636-37, 717-18, 960-61). Knight, Christmas, and Petrick met with Noonan to inform her of the results of the investigation. (JA 429).

F.  <u>CSC Did Not Retaliate Against Noonan.</u>

Noonan believes that, as a result of her pay disparity complaint, CSC retaliated against her by removing photography and e-mail marketing duties from her plate, and by adding more writing. While some photography duties were shifted to Petrick, the decision was prompted by a reduced need for photography (particularly lifestyle

---

[3] Knight considered whether Petrick should be involved in the investigation, and concluded there was no way to exclude her as Petrick was the person most familiar with the tasks performed within the small marketing department and the quality of the work. After consulting with legal counsel, CSC included Petrick in the investigation. (JA 705-06).

photoshoots) as a result of COVID-19 in 2020, as well as quality concerns in some areas of Noonan's photography. (JA 132-33, 932-33). As to the latter reason, Petrick began handling certain shoots herself because there were concerns about the inconsistent quality of Noonan's photos: sometimes a shoot would turn out well and other times the photo was so poor that it could not be used. (JA 132-33, 932-33).

Prior to Noonan's complaint, Petrick was already shooting some photos for social media, and CSC ended up using the photos for other marketing materials. (JA 933). Those photos were well-received, and CSC increased the volume of Petrick's photography work. (JA 933). Even so, Noonan still did photography in 2020, just not as much. (JA 132, 432-33).

E-mail marketing duties were not part of Noonan's job in 2020. CSC transitioned that work away from Noonan prior to her complaint. (JA 934). Noonan's earlier role in e-mail marketing had been to upload to the e-mail platform MailChimp, and to proofread the e-mails for error. (JA 132, 934). The e-mail marketing tasks were small, taking 5-10 minutes per e-mail so Petrick did not think to have a specific discussion with Noonan about the task. (JA 133, 935-36). Noonan did not contact Petrick, Christmas, Knight, or anyone else at CSC to ask them why her tasks were changing or to complain about the change. (JA 452).

G. Wiese and Noonan are Laid-Off in June 2020.

As a further result of the economic downturns (including the pandemic), CSC

10

made additional cutbacks in 2020. (JA 751-52, 800-01). Wiese and Noonan were let go in June 2020 as part of a layoff in which seven people were terminated. (JA 656, 659).

CSC offered Noonan and Wiese the same severance agreement. (JA 745). The agreement stated that CSC would provide a neutral reference upon request. (JA 747). Wiese signed the agreement. (JA 746-47). Noonan did not. (JA 661).

After the lay-offs, Petrick sent Wiese and Noonan identical text messages asking if there was anything she could do to help. (JA 133, 152-53, 477). In response, Wiese requested a reference. (JA 133). Noonan's response was, "Thank you for the opportunity." (JA 133, 152). Petrick provided Wiese a letter of reference because he asked for one. (JA 133, 153, 957). Noonan did not request a recommendation from Petrick, and therefore did not receive one. (JA 973). This is because – by Noonan's admission – she didn't think she needed one. (JA 477-78: Noonan explaining that she did not ask Petrick for a reference because "I didn't feel like I needed it.").

Noonan later asked Christmas "to serve as a reference," and Christmas initially agreed because she mistakenly thought that Noonan had signed the severance agreement which promised a neutral reference. After learning that Noonan did not sign the severance agreement, Christmas declined the request. (JA 481, 661).

No one at CSC prevented Christmas from providing a reference for Noonan. Indeed, CEO Knight cleared Christmas to serve as a reference for Noonan, (JA 742-

11

43), but Christmas ultimately decided she preferred not to. (JA 741, 743). As it turned out, Noonan didn't need Christmas' help as she "had gotten the job anyway without her reference." (JA 481).

H.    After the Lay-Off, Noonan and Wiese Found New Positions

After CSC, Noonan took a position as a brand manager with Kindred Bravely, a female clothing company. (JA 487-88). In her new job, Noonan does no graphic design work. (JA 492). None of the over-50 jobs for which Noonan applied were graphic designer jobs. (JA 495, 498). Wiese now works as a visual designer, and all of his tasks are related to graphic design. (JA 1123-24).

## SUMMARY OF ARGUMENT

Noonan's appeal looks much different than the case she pled. In her complaint, she alleged that this was a comparator case. After the district court rejected that theory, Noonan abandoned her comparator approach and she now argues that she has presented direct and circumstantial evidence of gender-based pay discrimination. Thus, Noonan has changed horses in the middle of the track.

This appeal fails regardless of the theory asserted. Noonan does not appeal the district court's finding that she and Wiese performed different work and were not similarly-situated, and accordingly that finding is final and binding on her. That unappealed finding is fatal to her Title VII claim because *it is* the legitimate nondiscriminatory reason CSC asserted for the pay disparity. Having failed to appeal

the district court's finding that she and Wiese did not perform similar work, Noonan cannot contest that CSC has stated a legitimate nondiscriminatory reason for the difference in pay. Nevertheless, Noonan's evidence does not create triable issues of fact as to whether CSC intentionally discriminated against Noonan.

Noonan's retaliation claim fares no better than her Title VII claim. Considering factual context as it must, the district court correctly concluded that Noonan did not experience any materially adverse consequence from CSC's actions. The acts she alleges as retaliatory did not cause her significant – or any – detriment. Noonan admitted that she knew Petrick's statement about discussing another employee's salary was wrong and she was not disciplined for discussing another employee's salary. She also admitted that she still retained some photography duties, still performed writing duties, and never complained about any adjustment in her work responsibilities. Finally, she admitted that she did not need a reference from CSC and got a job without one. There is no evidence that she suffered any actual harm, let alone material harm, from any of CSC's actions.

Thus, at best, Noonan experienced mild annoyances or inconveniences that do not satisfy the weighty "materially adverse" standard required to support a retaliation claim. And even if Noonan did satisfy that standard, she failed to forecast evidence that CSC's legitimate nonretaliatory reasons were a pretext for retaliation. Indeed, she does not argue pretext at all.

13

## **ARGUMENT**

## I.   **THE DISTRICT COURT PROPERLY GRANTED CSC SUMMARY JUDGMENT ON NOONAN'S TITLE VII CLAIM.**

### A. STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*, viewing the facts in the light most favorable to Noonan and drawing all inferences in her favor. *See EEOC v. Cent. Wholesalers, Inc*., 573 F.3d 167, 174 (4th Cir. 2009).

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant meets this standard when the plaintiff fails to produce evidence that could justify a verdict in her favor. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015). "Summary judgment will be granted unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 185 (4th Cir. 2004).

### B. ARGUMENT

1.   Noonan Abandons Her Reliance On Comparator Evidence And Does Not Challenge the District Court's Finding That Her Comparator Was Not Similarly Situated.

To establish a prima facie case under Title VII, Noonan must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse

employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *Gerner v. Cty. of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012).

Sex-based wage discrimination claims under Title VII require a showing of intentional discrimination. *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019). A plaintiff may prove intentional discrimination through direct or circumstantial evidence of discrimination. *Id.* Alternatively, she may must "develop an inferential case" using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.*

The *McDonnell Douglas* test is the "judicial playbook for evaluating discrimination claims" and the use of comparator evidence "is one of the most salient aspects of that framework." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). Like most Title VII plaintiffs, Noonan based her Complaint on comparator evidence, alleging that her "comparator is Matthew Weise" and that she was paid less than Wiese for performing the same work. (JA 22-25, ¶¶ 110, 136, 141).

Using the *McDonnell Douglas* framework, the district court held that Noonan failed to establish a prima facie case of sex-based wage discrimination because "she has failed to identify a better-paid male comparator . . . who was similarly situated." (JA 1433). On appeal, Noonan does not challenge the district court's finding that Wiese is not a similarly-situated comparator. Indeed, she abandons her reliance on

comparator evidence altogether, even though it is the traditional and preferred way to evaluate sex-based discrimination claims under the *McDonnell Douglas* test.[4] *Laing*, 703 F.3d at 719.

Noonan's decision not to appeal the district court's finding that Wiese was not a proper male comparator and to proceed without comparator evidence on her Title VII claim has at least three significant consequences.

First, the district court's unappealed finding that Wiese was not a proper comparator under *McDonnell Douglas* is final and binding. *Humane Soc'y of the United States v. Nat'l Union Fire Ins. Co.*, 757 Fed. Appx. 270, 270 (4th Cir. 2019) (citing *United States v. Cohen*, 888 F.3d 667, 685 (4th Cir. 2018)). This ruling is now the law of the case.

Second, even if Noonan could make a prima facie case under Title VII, the district court's unappealed finding that Wiese did not perform a similar job to

---

[4] This Court has recognized a strong preference for comparator evidence:

> federal courts now routinely rely on comparator evidence when deciding whether an adverse employment action was driven by a discriminatory motive. One commentator has gone so far as to observe that comparator evidence has become a "defining element of discrimination law."

*Laing*, 703 F.3d at 719 (internal citations omitted). Use of comparator evidence to prove Title VII pay-disparity claims is a "simpler, more direct method of establishing discrimination" and is "more objective in nature." *Id.* Thus, Noonan has elected to take the more difficult – and less traditional – path to prove her claim.

Noonan is fatal at the pretext stage. This is so because Noonan cannot contest CSC's legitimate nondiscriminatory reason for the difference in pay between Wiese and Noonan: they performed different jobs, as the district court held. (JA 1433). Consequently, even if the analysis proceeded past the prima facie stage, the finding that Wiese and Noonan had dissimilar jobs is dispositive on the issue of pretext.

Third, Noonan's shift away from comparator evidence is inconsistent with her First Amended Complaint. Indeed, that complaint is built on the premise that Wiese is a male comparator. (JA 22, 25). She should not be permitted to change positions after her principal theory failed in the district court.

2.    There Is No Evidence Of Intentional Sex-Based Wage Discrimination.

Noonan contends that she does not need comparator evidence because she presented "direct evidence of discrimination." (Noonan Br. at 19; *see also* 11-12, 21). She contends that "discriminatory intent may be inferred from a general pattern of paying the multiple women in the marketing department below the industry standard, and below what Noonan's own supervisor testified was fair, while paying the man at or near the market rate." (*Id.* at 14-15, 21: describing this evidence as "blatant discrimination"). She also asserts that CSC's pay secrecy policy and a stray comment from her supervisor further demonstrate CSC's intent to discriminate against her because of her sex. (*Id.* at 20-22).

None of this "evidence" – whether viewed in isolation or together – satisfies Noonan's burden of showing intentional discrimination.

a. <u>Noonan cites no authority that supports her claim that her pay disparity evidence satisfies her burden of establishing a prima facie case of sex-based pay discrimination.</u>

Noonan relies on *County of Washington v. Gunther*, 452 U.S. 161 (1981) and *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 111 (2d Cir. 2019) for the proposition that she has stated a prima facie of sex-based wage discrimination. Neither case is applicable and both cases are distinguishable.

The issue in *Gunther* was a "narrow" one: whether female plaintiffs alleging intentional sex-based wage discrimination could sue under Title VII without showing that they performed "equal work" to male employees, as the EPA requires. 452 U.S. at 163 and 166 (emphasizing the "narrowness" of the question presented). The Court answered this question in the negative, holding that the EPA's "equal work" requirement does not apply to Title VII sex-based discrimination cases. *Id.* at 181.[5]

---

[5] Notably, the *Gunther* Court held that the EPA's affirmative defenses *do apply* in Title VII cases. 452 U.S. at 171, 176. Therefore, a plaintiff may bring a sex-based wage discrimination under Title VII even though no member of the opposite sex holds an equal but higher-paying job, but only if the challenged wage rate does not come within the affirmative defenses applicable to wage rates based on seniority, merit, quantity or quality of production, or "any other factor other than sex." *Id.* at 168 (citing 29 U.S.C. § 206(d)(1)). As discussed in more detail later, CSC's affirmative defenses are dispositive on Noonan's Title VII claim.

Given the "narrow question" before it, *id.* at 166, the *Gunther* Court did not pass on the sufficiency issue presented here. *Id.* at 166, n.8. Indeed, the Court recognized that "[w]e are not called upon in this case to decide whether respondents have stated a prima facie case of sex discrimination under Title VII . . . or to lay down standards for the further conduct of this litigation." *Id.* Thus, the Court did not reach the question whether the plaintiffs presented sufficient evidence to state a prima facie case.

Nevertheless, Noonan claims that the evidence in *Gunther* "is identical to the evidence in the record before this Court," (Noonan Br. at 12), and incorrectly asserts that the Supreme Court in *Gunther* reversed on sufficiency grounds. (*Id.* at 14: "it is clear the [*Lenzi*] Court found the sex-based pay difference alone to be sufficient, as the United States Supreme Court did in *Gunther*"). Because the Supreme Court did not reach the issue of sufficiency in *Gunther*, *id.* at 166, n.8 ("We are not called upon in this case to decide whether respondents have stated a prima facie case of sex discrimination under Title VII . . . "), this case does not support Noonan's position.

Similarly, *Lenzi v. Systemax, Inc.* does not advance Noonan's argument that she established a prima facie case of discrimination. In *Lenzi*, the Second Circuit reversed the district court's holding – which was clearly erroneous under *Gunther* – that the plaintiff failed to establish unequal pay for equal work in a Title VII case. 944 F.3d at 110-11.

Additionally, the Court reversed the district court's holding that the plaintiff failed to make a prima facie case of discrimination. *Id.* at 112. On the record before it, the Court held that the plaintiff made a prima facie case where (1) statistical evidence showed that the employer paid the plaintiff below the market rate for her position while paying all of her male peers above market rate *and* (2) there was direct evidence of "pervasive" disparagement of women. As to the second category of evidence, the Court summarized the conduct of the company's CFO, who "consistently made remarks about his sex life and about women":

> [CFO] Reinhold made graphic comments about his dating and sex life, made disparaging remarks about his ex-wife, and "would comment on women's bodies. He would send out emails about stereotypical things with women. He would email fat pictures about women. He would comment on who he would do [i.e., have sex with] within the organization and there were many, many more." Reinhold also commented on the way Markou dressed at work. In her 2009 performance review, Reinhold stated that he wanted Markou "to focus . . . on her executive image." He also once commented that he thought a skirt Markou wore to work was too short. According to Markou, Reinhold did not comment on the physical appearance of the men who reported to him.

*Id.* at 111 (appendix citations omitted).

Contrary to Noonan's claim, the plaintiff's wage disparity evidence in *Lenzi* was not "alone" enough to infer discriminatory intent. (Noonan Br. at 14). After considering the statistical wage disparity evidence and the pervasive comments disparaging women, the Second Circuit held that this evidence "[t]aken together" established a prima facie under Title VII. *Lenzi*, 944 F.3d at 112.

Noonan's proffered evidence does not come close in quality or quantity to that in *Lenzi*. First, her evidence of wage disparity was not based on statistical evidence. Rather, it was based on Petrick's unscientific effort to support wage increases for *all of her staff*. Even Petrick admitted that her industry wage figures were essentially her opinion. (JA 830-35, 838). Therefore, they lacked a scientific or reliable basis.

Second, unlike the plaintiff in *Lenzi*, Noonan did not proffer wage evidence showing that she was paid below-market wages while CSC paid Wiese an "above market rate for" his position. *Lenzi*, 944 F.3d at 111. According to Noonan's evidence, all of the employees in her department were paid below-market, including Wiese and her supervisor Petrick. (JA 1352; Noonan Br. at 16). By contrast, in *Lenzi*, all the males in the plaintiff's peer group had wages that significantly or substantially exceeded market rates, whereas the plaintiff was paid substantially below-market. 944 F.3d at 104.

Third, Noonan did not offer any evidence of pervasive gender discrimination or discriminatory comments as the plaintiff in *Lenzi* did. *Id*. at 111. There was no evidence that CSC's leadership (or anyone else) routinely – or ever – made disparaging remarks about women. Thus, Noonan's evidence falls short of the powerful evidence of discriminatory animus presented by the *Lenzi* plaintiff.[6]

---

[6] To the extent that Noonan relies on a pattern and practice of pay discrimination, she fails to achieve her objective. First, she has not pled intentional discrimination in violation of Title VII based upon pattern and practice. Second, the only evidence

Noonan does not cite any authority that establishes error in the district court's decision.[7] In short, Noonan failed to establish a prima facie case of sex-based discrimination under Title VII.

### b. There is no other evidence of intentional discrimination.

Noonan argues that she has other evidence of intentional discrimination: (1) a company policy of pay secrecy and (2) that Noonan was "shamed" when she asked for a raise. None of these additional grounds creates a dispute of material fact.

First, Noonan's "pay secrecy" argument, (Noonan Br. 20-21), which is based on CSC's policy discouraging discussion about salaries, (JA 1325), is legally

---

she can point to is Petrick's email to a co-worker requesting raises for her department based on her opinion of "local industry standards." Even if this were the type of statistical evidence required to establish pattern and practice discrimination, "statistics cannot alone prove the existence of a pattern or practice of discrimination, or even establish a prima facie case." *Earl v. Norfolk State Univ.*, 2014 U.S. Dist. LEXIS 18583, at *21 (E.D. Va. Feb. 13, 2014) (internal quotations and citation omitted). Knight, Kumar, Christmas, Carrington, and even Petrick herself testified that the figures in Petrick's email were not accurate and were simply Petrick's attempt to secure raises for her department. (JA 640-43, 706, 711-13, 830-35, 838, 1242-44). Further, the job titles in the email were not correct, (i.e., Noonan was not a "Photographer") and Petrick testified that she simply made a guess based upon information she could find online. *Id.*

[7] The other cases that Noonan cites are offered for the unremarkable proposition that a plaintiff is not required to rely on comparator evidence to prove a Title VII claim for sex-based pay discrimination. (Noonan Br. at 10-11). These cases do not prove that Noonan's skimpy factual support actually presents a prima facie case under Title VII. Again, Noonan's complaint is based on comparator evidence, and she has now switched theories on appeal.

insufficient to support her prima facie case. She bases her argument on the Lily Ledbetter Fair Pay Act of 2009. But that Act simply amended Title VII "to clarify that a discriminatory compensation decision or other practice that is unlawful under such Acts occurs each time compensation is paid." Pub. L. 111-2. The Act is a response to *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), which Congress found "undermines those statutory protections by unduly restricting the time period in which victims of discrimination can challenge and record for discriminatory compensation decisions or other practices." *Id.* at Sec. 2(1). Because Noonan timely filed her Title VII claim, the Lily Ledbetter Fair Pay Act is wholly irrelevant.

Noonan nevertheless asserts that "[p]ay secrecy provisions are inherently suspect and the actions of companies that have them deserve close scrutiny" under Title VII. (Noonan Br. at 21). She cites no case authority for this proposition.[8] This is no surprise as such policies are gender-neutral.

Noonan's argument is also factually insufficient. According to Noonan's declaration, Petrick told Noonan that "it was a fireable offense to know another employee's salary."[9] (JA 1299). It is undisputed that Petrick was simply mistaken

---

[8] Noonan argues that such policies are illegal under the National Labor Relations Act. (Noonan Br. at 20). But she has not challenged any CSC policy under that Act.

[9] Notably, CSC's handbook does not state that a discussion about an employee's pay is an offense that could result in termination. (JA 1325).

(JA 113, 911-12); Petrick later apologized to Noonan (JA 131, 615); and Christmas quickly corrected Petrick's statement. (JA 614-15). Most importantly, Noonan experienced no adverse action for discussing wages with her co-workers, and CSC never even contemplated any adverse action. (JA 131, 422, 755-56). Therefore, Noonan's "pay secrecy" argument fails to create a factual dispute that would avoid summary judgment.

Second, Noonan claims that discriminatory intent is also evident from an isolated comment from Petrick: she asked Noonan if money was the most important thing to her when Noonan asked for a raise, but did not ask the same question of Wiese. (JA 504-05). This single comment evinces no discriminatory animus and is an innocent question about what is important to Noonan. Further, this "stray remark" is the kind that this Court has routinely found insufficient to prove intentional discrimination. *E.g.*, *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010) ( "in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced").

Although Noonan argues that it is traditionally considered undesirable for women to ask for a raise, (Noonan Br. at 21), it is undisputed that (1) CSC encouraged employees to ask for raises; (2) Petrick had previously tried to increase the salaries of the employees she supervised, including Noonan (JA 785-86, 1248); and (3) when Noonan asked for a raise that CSC could not provide, she and Petrick

instead decided that Noonan would receive a change in title to "Senior Photographer and PR Specialist." (JA 130, 148, 157, 378-80, 903-04, 939). These undisputed facts belie Noonan's suggestion that Petrick's innocuous and isolated statement was evidence of discriminatory animus towards Noonan.

In short, Noonan has not come forward with evidence that demonstrates intentional pay discrimination based on her gender.

c. <u>The circumstances actually negate an inference of discrimination.</u>

The Fourth Circuit recognizes the "common sense notion" that when a decision-maker is a member of the same protected class as a plaintiff who claims discrimination based upon her membership in that class, it is unlikely that membership in the protected class was the basis for the complained-of decision. *Orgain v. City of Salisbury*, 305 Fed. Appx 90, 103 (4th Cir. 2008); *see also McNeal v. Montgomery Cty.*, 307 Fed. Appx 766, 775 (4th Cir. 2009); *Laurent-Workman v. McCarthy*, 2021 U.S. Dist. LEXIS 111411, 2021 WL 2426118, at *23 (E.D. Va. June 11, 2021).

This principle applies here. A woman (Valentine) hired Noonan; Valentine and Noonan negotiated Noonan's salary, and Valentine ultimately set the salary. Valentine supervised Noonan until Petrick (another woman) returned to CSC in 2017. (JA 75-6, 126, 228, 253-54). Petrick worked under and at the direction of CSC's CEO, Knight (a woman). (JA 75). Noonan's request for a raise was fielded

and denied by Petrick, a woman. (JA 75, 378-80). Further, Noonan's pay disparity claim was investigated by a team of three women, who all concluded that there was no gender discrimination. (JA 75-6, 131-32, 636-37, 717-18, 960-61). These undisputed facts negate, rather than support, an inference of discrimination.

3.  If Noonan Stated A Prima Facie Case of Discrimination, CSC Rebutted It.

Even if Noonan has stated a prima facie case of discrimination, her claim cannot proceed. "Once a plaintiff establishes a prima facie case, the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory explanation for the wage disparity." *Spencer*, 919 F.3d at 208. Under the four recognized affirmative defenses, wage decisions based on seniority, merit, quantity or quality of production, or "any other factor other than sex" are not actionable. *Id.*; *Gunther*, 452 U.S. at 168 (agreeing that "claims for sex-based wage discrimination can be brought under Title VII even though no member of the opposite sex holds an equal but higher paying job, provided that the challenged wage rate is not based on seniority, merit, quantity or quality of production, or "any other factor other than sex.").

CSC articulated a legitimate nondiscriminatory reason for the difference in Wiese and Noonan's pay: they did not perform the same work. Among other reasons, Wiese was an experienced graphic designer, Noonan was not a graphic designer and performed low-level marketing duties, and Wiese had superior qualifications and

skills. *See* discussion *infra* at 3-5. These reasons have nothing to do with gender. Therefore, the fact that Wiese and Noonan did not perform the same or similar work is a "factor other than sex," and therefore a defense to this claim.[10] *Spencer,* 919 F.3d at 206.

Noonan cannot contend otherwise. She has not appealed the district court's finding that Wiese and Noonan were not similarly-situated and had different roles with CSC. (JA 1433). This finding is dispositive on the issue of whether CSC articulated a legitimate nondiscriminatory reason for the pay disparity.

Having proffered a nondiscriminatory explanation, the burden shifts back to Noonan to prove that the explanation is a pretext for invidious discrimination. *Spencer*, 919 F.3d at 208. Her only "pretext" argument is a circular one: she contends that CSC failed to provide a legitimate nondiscriminatory reason for the pay differential. (Noonan Br. at 19). The district court's unappealed finding that Wiese and Noonan performed different work forecloses Noonan's pretext argument, and dooms her Title VII claim.

---

[10] That Wiese was essentially paid his prior salary is also a "factor other than sex." Thus, it qualifies as a legitimate, nondiscriminatory explanation under Title VII. *Spencer,* 919 F.3d at 206; *Wernsing v. Dep't of Human Servs., State of Ill.*, 427 F.3d 466, 468-70 (7th Cir. 2005).

## II.    NOONAN FAILED TO STATE A PRIMA FACIE CASE OF RETALIATION UNDER THE EPA OR TITLE VII.

### A. STANDARD OF REVIEW

The standard of review is the same as that for Argument I.

### B. ARGUMENT

To establish a prima facie case of retaliation, Noonan must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). To be actionable, the adverse employment action must be "both material and undertaken *because* of her complaints about salary equity." *Spencer*, 919 F.3d at 208 (citing *Burlington*, 548 U.S. at 68). Because the Supreme Court has cautioned that "context matters" in retaliation claims, courts must consider the circumstances of the claimed retaliation. *Burlington*, 548 U.S. at 68.

Noonan argues that CSC retaliated against her in three ways: (1) Petrick told her she could be fired for knowing Wiese's salary; (2) photography and email marketing tasks were taken away from her; and (3) Christmas failed to provide her with a reference. (Noonan Br. at 22-28). The district court correctly concluded that these actions were not materially adverse and were not taken *because of* Noonan's single complaint about pay-disparity. Therefore, Noonan failed to state a prima facie case of retaliation. (JA 1439-41).

28

1. Retaliation Claims Require A Specific Showing of Material Adversity; Trivial and Insubstantial Harms Are Not Sufficient.

The law does not "protect[] an individual from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 74. Although an adverse action need not "affect the terms and conditions of employment," *id.* at 64, there must be "some direct or indirect impact on an individual's employment as opposed to harms immaterially related to it." *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015). "The requirement of an adverse employment action seeks to differentiate those harms that work a 'significant' detriment on employees from those that are relatively insubstantial or 'trivial.'" *Id.* (quoting *Burlington*, 548 U.S. at 68).

"Material adversity" is viewed under an objective standard. *Burlington*, 452 U.S. at 68-69. To show "material adversity," a plaintiff must show that the harm in question might have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id*. at 68.

Where a plaintiff's employment status, wages, and terms of employment remain the same, she does not state an actionable claim of retaliation. *Cooper v. Smithfield Packing Co.*, 724 Fed. Appx 197, 202 (4th Cir. 2018); *see also Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999) ("absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse

employment action even if the new job does cause some modest stress not present in the old position"). Generally speaking, "[a]n actionable adverse employment action is one in which an employee suffers a discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone*, 178 F.3d at 255.

Noonan suffered none of these consequences. At best, she identifies what are – viewed objectively – insubstantial matters that did not cause her actual detriment. Therefore, the district court properly concluded that Noonan failed to satisfy the material adversity requirement.

2. The Allegedly Retaliatory Acts Are Neither Material Nor Adverse.

a. <u>Noonan suffered no material adversity as a result of Petrick's statement about discussing employees' salaries – a statement Noonan knew was incorrect and was promptly corrected by the HR Director.</u>

First, Petrick's isolated comment to Noonan that she could be fired for knowing the salary of her co-workers was inaccurate, but is not retaliatory.[11]

Courts have held that unrealized threats of termination and discipline are not actionable adverse actions. *E.g., Harris v. Herring,* 2021 U.S. Dist. LEXIS 6457, 2021 WL 100651, at *7 (E.D. Va. Jan. 12, 2021) ("[C]ourts in this circuit have repeatedly held that proposed termination[s], reprimands, performance

---

[11] Petrick denies making this statement. Instead, she testified telling Noonan "whoever told you [Wiese's salary] should be fired." (JA 911-12).

improvement plans, and negative performance evaluations do not constitute materially adverse action."); *Hernandez v. Johnson*, 514 Fed. Appx. 492, 499 (5th Cir. 2013) (a single threat that an employee could be fired for engaging in protected activity is insufficient to constitute a materially adverse action); *Brown v. SDH Educ. East, LLC*, 2013 U.S. Dist. LEXIS 184746, at *7 (D.S.C. Dec. 13, 2013); *Jones v. Johanns*, 264 Fed. Appx. 463, 469 (6th Cir. 2007) (threat to take disciplinary action against plaintiff is not a materially adverse action). But even if Petrick's statement could constitute materially adverse action in the abstract, the undisputed facts and factual context demonstrate that it is not.

Contrary to Noonan's suggestion, the district court did not miss the context. (Noonan Br. at 24). Christmas quickly corrected Petrick's incorrect statement, informing Noonan that she *could not* be fired for discussing an employee's pay, and Petrick later corrected herself and apologized to Noonan. (JA 131, 614-15). Noonan even admitted that she knew Petrick's statement was untrue at the time it was made, and told Petrick so. (JA 187, 421). Given Noonan's knowledge that Petrick was wrong and that Petrick corrected her statement, Noonan's argument that Christmas was not within the chain of command and was a mere "co-worker" (which is plainly incorrect) is irrelevant. (Noonan Br. at 24).

Within this context, the district court properly refused to credit Noonan's stated lack of trust in the multiple corrections of the inaccurate statement and the

efforts to clarify CSC's policies. *See Burlington*, 548 U.S. at 69-70 (material adversity is determined objectively based on the reaction of a reasonable employee). Indeed, CSC's handbook did not state that knowing another employee's salary was a fireable offense. (JA 1325). Viewing Petrick's isolated statement in context with the multiple corrections and Noonan's knowledge that Petrick was wrong, the statement could not reasonably dissuade an employee from engaging in protected activity.

Nor did this statement harm Noonan. Plainly Noonan was *not* terminated or disciplined for knowing Wiese's salary.[12] As the district court correctly observed, "far from firing Noonan, [CSC] actually investigated the claim." (JA 1440). CSC engaged in a serious, thorough, and appropriate investigation of Noonan's discrimination claim, and advised Noonan of the results of the investigation.[13] Noonan, therefore, cannot identify harm of any kind from Petrick's statement.

---

[12] Even if Noonan viewed Petrick's statement as an admonishment or reprimand, it still does not constitute a materially adverse action. Reprimands and warnings are not adverse action in a retaliation context. *See, e.g., Chughtai v. Kasier Permanente*, 2018 U.S. Dist. LEXIS 102848, 2018 WL 3049198, *23 (D. Md. June 20, 2018) ("plaintiff's belief that a written warning could have impacted later job performance evaluations was insufficient" to support a retaliation claim); *Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 832 (E.D. Va. 2016) ("This Court finds that reprimands without collateral consequences are akin to non-actionable snubbing, antipathy, and petty slights."). Thus, Noonan's failure to demonstrate any actionable harm from Petrick's single statement negates her retaliation claim.

[13] Contrary to Noonan's claim, Petrick was not solely responsible for the investigation. Knight, Christmas, and Petrick – all women – participated in the

Noonan relies heavily on *Rivera v. Rochester Genesee Regional Transportation Authority*, where a plaintiff survived summary judgment based on testimony that his supervisor told him that "he could lose his job for filing complaints of discrimination." 743 F.3d 11, 26 (2d Cir. 2012). But that is not what Petrick said. Noonan does not allege that Petrick told her that she "could be fired" for complaining of a pay disparity or any other protected activity; instead, Noonan testified that Petrick told her that discussing another employee's salary is a fireable offense. (JA 421). Again, Christmas and Petrick later dispelled any notion that discussing another employee's pay was a fireable offense. This factual context renders any analogy to *Rivera* impossible. Thus, *Rivera* – which is Noonan's sole authority – does not move the needle in her favor.

      b. <u>There is no evidence that any change in Noonan's job responsibilities was material, adverse, or "because of" her complaint.</u>

Second, Noonan asserts that she suffered a "hollowing out" of her primary job responsibilities. (Noonan Br. at 25). The district court found that "Noonan has not offered sufficient evidence from which one could reasonably infer both that [this] adverse action [was] material and [was] undertaken *because of* her complaints about

---

investigation of Noonan's complaint. (*E.g.*, JA 131-32). Based on their thorough investigation, they informed Noonan that the difference in her pay and Wiese's pay was based on differences in their jobs and experience, and not on gender. (JA 717-18, 429).

pay disparity." (JA 1441, emphasis in orig.). The court noted that "[t]here is no indication that she lost duties of greater prestige or ease" and Noonan "does not even testify that she was particularly devastated to lose these duties." (*Id.*). These findings are consistent with the record.

Noonan testified that after her complaint to Petrick, she "began having more writing," and "wasn't doing as many photo shoots"; "wasn't doing email marketing anymore"; and "wasn't doing business cards anymore." (JA 432-33). By her own account, Noonan did not lose all of her photography duties; she just "wasn't doing as many photo shoots." (*Id.*)

Even if Noonan's perceptions are accurate, there are no facts demonstrating that any change in tasks caused her harm, let alone material harm. Her title, position, and compensation did not change, and there is no evidence that the shift to more writing and less of her other responsibilities caused her any significant detriment. Although Noonan expresses concern about the change now, she raised no concerns at the time. (JA 452). Even so, annoyance and displeasure with this minor adjustment in work duties – without actual harm or detriment – does not rise to the level of "material adversity" under *Burlington*.

Equally important, Noonan admitted that she had no factual basis to conclude that any change in her job responsibilities occurred *because of* her complaint. When asked to identify facts or evidence showing that these changes were made "because

34

of" her complaint, Noonan merely testified that there was no "other" reason for the change,[14] (JA 432, 434-38), and no one communicated the change to her as had been the practice in her department.[15] (JA 505).

Neither of these reasons suggest a causal nexus between a modest adjustment of her duties and her complaint about pay disparity. Rather, these reasons are merely Noonan's opinion – untethered from the factual record and rooted in speculation. Noonan's opinion is insufficient to permit an inference that any change in job duties occurred "because of" a complaint about perceived pay disparity. *See Burlington*, 452 U.S. at 68-69 ("material adversity" is viewed under an objective standard).

    c.  <u>Where Noonan declined CSC's offer of a neutral reference and said she did not need a reference, Christmas' decision not to serve as a reference was not a materially adverse action.</u>

Third, the alleged lack of a reference does not rise to the level of a materially adverse action.

Once again, context is important. *See Burlington*, 548 U.S. at 69 ("context matters" in considering retaliation claims). Both Wiese and Noonan were laid off in

---

[14] Speculation aside, CSC reduced Noonan's photography duties as a result of a decreased need for photography as a result of COVID-19 in 2020, as well as quality concerns with some of her photography work. (JA 132-33, 432-33, 932-34). These are gender-neutral reasons unrelated to Noonan's protected activity. Moreover, Petrick had started doing more photograph before Noonan's complaint. (JA 133).

[15] The record belies Noonan's claim that she was not informed of any changes with her job duties. (JA 451).

the summer of 2020 due to the pandemic, and both were offered severance packages which included the offer of a "neutral recommendation." (JA 745, 747). Wiese signed the agreement, but Noonan did not. (JA 661, 746-47). Nevertheless, following the lay-off, Petrick sent identical text messages to Noonan and Wiese offering "to do anything I can do to help." (JA 133, 152-53, 477). Wiese responded by requesting a reference letter and Petrick provided it. (JA 133, 153). Noonan did not ask Petrick for a reference letter because "I didn't feel like I needed it."[16] (JA 152, 477-78).

Instead, Noonan later asked Christmas "to be a reference" and she declined after initially agreeing to do so. (JA 481, 661). CEO Knight cleared Christmas to serve as a reference for Noonan, (JA 742-43), but Christmas ultimately decided not to. (JA 741: "According to [Christmas], she personally didn't want to write the recommendation."; JA 743: Christmas stating: "I would rather tell [Noonan] I will not be able to give her a personal reference for my own personal reasons."). Thus, Christmas' decision not to serve as a personal reference for Noonan was a personal decision, not an action on behalf of CSC.

But it doesn't matter. As Noonan testified, "luckily, I had gotten the job anyway without her reference." (JA 481). Noonan was therefore right that she didn't

---

[16] Noonan admitted that she speculated that Petrick would not give her a positive reference. (JA 478: testifying that this assumption was "just [her] speculation").

need a reference letter from CSC. (JA 477-78). These admissions disprove Noonan's assertion that Christmas' decision not to serve as a personal reference – even if it could be viewed as a corporate action – was materially adverse. By her own admission, Noonan didn't need the reference and got another job without it. (JA 477-78, 481).

Noonan's sole factual support is Christmas' testimony. (Noonan Br. at 27-28). But that testimony actually negates any retaliation. Christmas testified that she initially thought Noonan was seeking the reference offered in CSC's severance package, and agreed to provide it based on the understanding that Noonan had signed the severance agreement. (JA 661). She later learned that Noonan did not sign the severance agreement.[17] (JA 661-62). Christmas did not even know that Petrick had provided Wiese a reference letter. (JA 662).

Based on this scant evidence, the district court held that "the HR Director's decision not to provide a reference for Noonan is explainable by the fact that Noonan rejected the severance agreement which offered a neutral recommendation." (JA 1441). It further noted that "the difference between a neutral letter offered as part of

---

[17] Noonan alleges that Christmas changed her mind about providing the letter "after speaking to management." (Noonan Br. at 28). The innuendo is misleading. It is undisputed that CEO Knight gave Christmas approval to provide a reference letter. (JA 742-43).

a severance agreement and no letter at all is insufficient to rise to the level of material adversity." (*Id.*).

The district court was correct. Considering the factual context, as the court must, Christmas' personal decision not to serve as a reference – after Petrick offered Noonan help – is neither material nor adverse. Noonan suffered no detriment as a result of Christmas' decision. Under these circumstances, Christmas' declination does not rise to the level of material adversity.

The cases Noonan cites in support of this argument are inapposite. In *Hall v. Charlotte Mecklenburg School*, the plaintiff, who filed an EEOC charge, alleged that her employer retaliated against her by providing "false negative references." 2014 U.S. Dist. LEXIS 78801, 2014 WL 2586889, at *27-28 (W.D.N.C. June 10, 2014). The district court in *Hall* recognized that "an unjustified negative job reference" may constitute adverse employment action in the retaliation context. *Id.* at *10. But no one at CSC gave Noonan a false negative reference. *Hall*, therefore, does not even concern the same issue that Noonan presents. Even so, the district court in *Hall* granted summary judgment for the employer, finding that the plaintiff's claims failed to establish a prima facie case of retaliation. *Id.*

Nor does *Trahanas v. Northwest University* support Noonan's argument. That case concerned the withdrawal of a favorable reference for medical school three days after plaintiff's FMLA leave began. 2020 U.S. Dist. LEXIS 241663, 2020 WL

7641293, *55-57 (N.D. Ill. Dec. 23, 2020). Again, this is not what happened in the present case; CSC did not retract a favorable reference. To the contrary, CSC offered Noonan any help she needed. (JA 133, 152-53, 477). The action in *Trahanas*, then, is a far cry from the allegations in the present case.

3.  If Noonan Stated A Prima Facie Case of Retaliation, CSC Rebutted It.

If a prima facie case of discrimination exists, the burden shifts to CSC "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997). CSC has offered the reasons described above: (1) Petrick's statement was based on a misunderstanding of CSC's policy and was promptly corrected; (2) Noonan's photography work was reduced due to a reduced need for photography during the pandemic and concerns about poor work product; and (3) Christmas made a personal decision not to serve as Noonan's reference after CSC approved the request and Noonan did not accept the neutral reference offered in the severance package. All of these reasons are legitimate and nonretaliatory.

Having stated legitimate nonretaliatory reasons for its actions, CSC has shifted the burden back to Noonan to show that these reasons are "mere pretext for retaliation by proving both that the reason was false, and that discrimination was the real reason for the challenged conduct." *Id.* (internal quotation marks omitted). With pretext, it is "the perception of the decisonmaker which is relevant not the self-

assessment of the plaintiff." *Id.* (internal quotation marks omitted). Noonan does not argue that these reasons were a pretext for retaliation.

Therefore, even if Noonan stated a prima facie case of retaliation, CSC rebutted the presumption.

## **CONCLUSION**

CSC respectfully requests that the judgment below be affirmed.

## **REQUEST FOR ORAL ARGUMENT**

CSC requests leave to present oral argument in support of its position if the Court believes that argument will aid the decisional process. However, CSC disagrees with Noonan's assertion that this appeal concerns "novel" questions. All the issues on appeal are resolved by the application of existing law to the facts of the case.

CONSOLIDATED SHOE COMPANY, INC.

By: /s/ Monica T. Monday
                  Of Counsel

Monica T. Monday (VSB No. 33461)
monday@gentrylocke.com
Catherine J. Huff (VSB No. 78610)
huff@gentrylocke.com
GENTRY LOCKE
10 Franklin Rd., S.E.
P.O. Box 40013
Roanoke, Virginia  24022-0013
Phone:  (540) 983-9300
Fax:   (540) 983-9400
*Counsel for Appellee*

### CERTIFICATE OF COMPLIANCE WITH TYPEFACE
### AND LENGTH LIMITATIONS

1.    This brief has been prepared using:

  __X__       Fourteen point, proportionally spaced, serif typeface (such as CG Times or Times New Roman, NOT sans serif typeface such as Arial).  Specify software name and version, type face name, and point size below (for example, WordPerfect 8, CG Times, 14 point):

          Microsoft Word, Times New Roman, 14 point

2.    EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains

 9,591  Words (give specific number of pages; may not exceed 12,000 words for opening or answering brief); **OR**

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

          /s/ Monica T. Monday
          Signature of Filing Party