NO. 21-2328

# United States Court of Appeals

*for the*

# Fourth Circuit

---

ASHLEY NICOLE NOONAN, f/k/a Ashley Culpepper,

*Plaintiff-Appellant,*

– v. –

CONSOLIDATED SHOE COMPANY, INC,

*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA AT LYNCHBURG

## APPELLANT'S BRIEF IN REPLY

JOHNEAL M. WHITE
GLENN ROBINSON CATHEY MEMMER
  & SKAFF PLC
400 Salem Avenue, SW, Suite 100
Roanoke, Virginia 24016
(540) 767-2200 - Phone
(540) 767-2220 - Fax
jwhite@glennrob.com

*Attorney for Plaintiff-Appellant*

## TABLE OF CONTENTS                                       p.

TABLE OF AUTHORITIES……………..……………………………,..…...ii

ARGUMENT AND AUTHORITIES…......……………………………..……1

I. Defendant spends an inordinate amount of time on an issue that is not before this Court because, as its brief reveals, it has no legitimate non-discriminatory reason for paying Plaintiff and other women in the marketing department unfairly while paying the male employee fairly……………………………………………………..…..1

    A. The evidence in this case is exactly like in Gunther and better than in Lenzi ………………………...............................................……………………4

    B. Discrimination is a feature of pay secrecy, not a bug…………….……..…..5

    C. Defendant's attempt to shame Plaintiff from asking for a raise is directly tied to Defendant's discrimination against Plaintiff…………………………...7

    D. The sex of the some of the decision-makers is irrelevant……………..………9

II. Defendant cites to cases that either pre-exist Burlington or were actually considering the substantive discrimination claims that are judged by a different standard……………………………………………………………………………10

    A. The threat to fire Noonan is materially adverse under 4th Circuit precedent………………………………………...…………………………13

    B. The admitted change in Noonan's job responsibilities was materially adverse and related to the protected activity…………………..……………………14

    C. The failure to give Noonan a reference is directly tied to the instant lawsuit and further evidence of the disparate treatment between Noonan and her male colleague…………………………………………..…………………….15

TABLE OF AUTHORITIES                          p.

**<u>Cases</u>**

*Amirmokri v. Abraham*, 437 F.Supp.2d 414, 423 (D.Md. 2006)…………………13

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)………2

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)………………………………………………………………………………..2

*Blackman v. Town of Front Royal*, CIV. ACTION NO. 5:99CV00017, 2000 U.S. Dist. LEXIS 17512, at *29 (W.D. Va. Oct. 19, 2000)………………………………...5

*Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003)………...3

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)………………………………………….………...10,11,12,13,14

*Butler v. N.Y. Health & Racquet Club*, 768 F. Supp. 2d 516, 523 (S.D.N.Y. 2011)……………………………………………………………………………..7

*Calobrisi v. Booz Allen Hamilton, Inc.*, 660 F. App'x 207, 209 (4th Cir. 2016)...…5

*Cty. of Wash. v. Gunther*, 452 U.S. 161, 101 S. Ct. 2242 (1981)………....………3,4,5

*EEOC v. Grinnell Corp.*, 881 F. Supp. 406, 408 (S.D. Ind. 1995)……………………………………………………………….……...7

*Gunther v. Cty. of Wash.*, 623 F.2d 1303, 1314 (9th Cir. 1979)………………3, 4,5

*Harris v. Herring,* 2021 US Dist. LEXIS 6457……………………………...11, 12

*Ikome v. CSRA, LLC*, 2019 U.S. Dist. LEXIS 120711, (D. Md. July 19, 2019)….8

*Johnson* v. *Transportation Agency, Santa Clara Cty.*, 480 U.S. 616, 94 L. Ed. 2d 615, 107 S. Ct. 1442 (1987)…………………………………………………………9

*Kassman v. KPMG LLP*, 2015 U.S. Dist. LEXIS 118542, at *15-16 (S.D.N.Y. Sep. 4, 2015)……………………………………………………………….......……6

*Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 645, 127 S. Ct. 2162, 2178-79 (2007)……………………………….......……………………………..5,6,7

*Lenzi v. Systemax, Inc.*, 944 F.3d 97 (2d Cir. 2019)……………………..…4,5

*Maron v. Va. Polytechnic Inst. & State Univ.*, 508 F. App'x 226, 230-31 (4th Cir. 2013)…………………………………………………………………..…11

*McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals,* 140 F.3d 288, 296 (1st Cir. 1998)…………………………………………………………...…7

*Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1014 (11th Cir. 1994 ………..…..7

*Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010)….7

*Newman v. Giant Food Inc.*, 187 F.Supp.2d 524, 528-29……...…………………13

*O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548-49 (4th Cir. 1995)…8

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001 (1998)…………………………………………………………………..9, 10

*Orgain v. City of Salisbury*, 305 F. App'x 90 (4th Cir. 2008)……………………9

*Rattigan v. Holder*, 604 F. Supp. 2d 33, 52-53 (D.D.C. 2009)……………..……10

*Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 1002 (5th Cir. 1996)……………..9

*Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011)…………………12

*Schafer v. State Dep't of Health & Mental Hygiene*, 359 F. App'x 385, 389 (4th Cir. 2009)……………………………………………………………………8

*Spencer v. Va. State Univ.*, 224 F. Supp. 3d 449, 460 (E.D. Va. 2016)…………10

*Stevenson v. City of Seat Pleasant,* 743 F.3d 411, 417 (4th Cir. 2014)…………..2

*Tolton v. Jones Day*, 2020 U.S. Dist. LEXIS 87793 (D.D.C. May 19, 2020)……6

*Toulan v. DAP Prods., Inc.*, 2007 U.S. Dist. LEXIS 4087………………………13

*Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992)………………..…1

*Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480 (D. Md. 2013) …..12

## **Rules**

Federal Rule of Civil Procedure 8(a)(2)…………………………………………2

**<u>Law Review Articles</u>**

Sarah Lyons, Note, *Why the Law Should Intervene to Disrupt Pay-Secrecy Norms: Analyzing the Lilly Ledbetter Fair Pay Act Through the Lens of Social Norms*, 46 Colum. J.L. & Soc. Probs. 361, 380 (2013)……………………………………………………………………………….8

In reviewing a motion for summary judgment, the court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion." *Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992), cert. denied, 122 L. Ed. 2d 671, 113 S. Ct. 1276 (1993). Unfortunately CSC attempts to cast the facts in this case (and in some instances create issues of fact) favorable for itself, and not Noonan as is proper. When reviewing the facts in the light most favorable for Noonan it is clear that CSC has no explanation for why it believes it permissible to pay all of the women in the marketing department below market rate while paying the male employee at or near the market rate. It is also clear that CSC retaliated against Noonan by threatening termination, taking away her core job duties and pressuring the HR director into not giving her a reference while giving her male colleague a glowing one.

## ARGUMENT AND AUTHORITIES

**I.      Defendant spends an inordinate amount of time on an issue that is not before this Court because, as its brief reveals, it has no legitimate non-discriminatory reason for paying Plaintiff and other women in the marketing department unfairly while paying the male employee fairly.**

Defendant argues that Plaintiff switches horses mid-race based on her Title VII claim. This is simply untrue. Plaintiff alleged in her Amended Complaint that: "3. CSC violated Title VII of the Civil Rights Act of 1964 when it subjected

1

Culpepper to disparate treatment, including unequal pay for the work she performed, based on her sex." JA 7. The Amended Complaint continues, in Paragraphs 44-62, (JA 11) to layout the exact factual basis that creates her disparate pay claim under Title VII, concluding with paragraph 63: "CSC paid male members of the marketing department 97.1% of what it believed they should be making based upon the local industry standard, and paid female employees between 56.6% and 71.5% of what it believed they should be making based upon the local industry standard." JA 11-12. As this Court opined in *Stevenson v. City of Seat Pleasant, Maryland*, the standard for stating a claim is governed by *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). *Stevenson, supra 417*. "Appellants, however, were not required to use any precise or magical words in their pleading." *Id.* at 418. "Legal labels characterizing a claim cannot, standing alone, determine whether it fails to meet the standard for notice pleading pursuant to Federal Rule of Civil Procedure 8(a)(2).". *Id.*

CSC engages in this legerdemain because, as its brief makes clear, the Defendant has NO legitimate non-discriminatory reason for the disparate treatment of Plaintiff and other female employees in the marketing department. CSC has never been able to answer the question posed below:

Q. Okay. What they were actually being paid, though –

2

A. Yes.

Q. -- I think you've testified was too little for those positions.

A. I agree.

Q. And what he was being paid was the correct amount for his position.

A. I agree.

**Q. Why is that -- is that okay to do?**

MS. HUFF: Objection to form. Go ahead.

THE WITNESS: Yeah. I guess they were hired before I was there, and that was the salary they agreed to join with. So I was petitioning for their raises to get them where I thought was a fair price.

The above testimony is an admission that Plaintiff and her female co-workers in the marketing department were being paid unfairly and nothing was ever done to remedy it. This Court held in *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) that the employers inability to offer an explanation for its treatment of the Plaintiff constituted a reasonable basis for the jury to find an intent to discriminate. In this case, the Defendant employer has no answer for why it was okay to treat the women in the marketing department in such a disparate manner. Instead, CSC focuses on an issue not before this Court - why Mathew Wiese is not an appropriate comparator and thus why Defendant was justified in giving him a higher salary. However, once the appropriate salary for each was determined by the employer (as it was in this case and *Gunther,infra*) the question then becomes what is the non-discriminatory explanation for why Defendant did not pay that salary – they have no explanation for it other than "because we could." The District Court completely

failed to address this question, necessitating that this case be reversed and remanded for trial.

A. **The evidence in this case is exactly like in *Gunther* and better than in *Lenzi***

In *Cty. of Wash. v. Gunther*, 452 U.S. 161, 101 S. Ct. 2242 (1981) the Supreme Court affirmed the 9th Circuit Court of Appeals. The 9th Circuit opinion gives more factual detail as to the Plaintiffs' claims in that case. The Court wrote, "at trial, the plaintiffs offered evidence that a portion of the discrepancy between their salaries and those of the male guards could be ascribed only to sex discrimination. We think that on remand the district court should consider this evidence." *Gunther v. Cty. of Wash.*, 623 F.2d 1303, 1314 (9th Cir. 1979). The Court explained the nature of that evidence noting, "[f]or instance, Sheriff Barnes testified that he thought the disparity between the salaries of the matrons and the deputies should have been less. In fact, the sheriff had previously attempted to upgrade the salary of the matrons." *Id*. at fn. 11. That is exactly the evidence we have in this case – Petrick's email and her testimony confirm that Noonan's own supervisor believed the disparity between Noonan and Weise (and Demeo and Weise) should have been less.

The evidence in this case is actually stronger than what the Second Circuit found sufficient *Lenzi v. Systemax, Inc.*, 944 F.3d 97 (2d Cir. 2019). In *Lenzi* the Court was only looking at the comparative value of one female employee. In this

case, we have multiple female employees showing multiple discrete instances of discrimination. This is exactly the type of "other employee" evidence that is admissible if it is closely tied "to the plaintiff's circumstances and theory of the case." *Calobrisi v. Booz Allen Hamilton, Inc.*, 660 F. App'x 207, 209 (4th Cir. 2016). In this case, it is very closely related because it shows the decision-making at a single moment in time for multiple female employees, all of whom fared worse than the male. Furthermore, CSC's attempt to distinguish *Lenzi* on the basis that Wiese was paid 97% of what CSC evaluated the worth of his job to be and not above market rate is inconsistent with the way *Gunther* has been applied by other courts in this Circuit. *See e.g.* In *Blackman v. Town of Front Royal*, CIV. ACTION NO. 5:99CV00017, 2000 U.S. Dist. LEXIS 17512, at *29 (W.D. Va. Oct. 19, 2000) denying summary judgment when Plaintiff's "wage is proportionately lower than comparable white laborers." It is also nonsensical to think that Title VII blesses an arrangement where female employees are paid well below the market rate just as long as male employees are not paid one penny more than the market rate.

## B. Discrimination is a feature of pay secrecy, not a bug.

In this case, CSC argues the pay secrecy policy is gender neutral and thus the its use to attempt to silence a claim of pay inequality is not suspect or indicative of an intent to discriminate. However, as Justice Ginsburg recognized in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 645, 127 S. Ct. 2162, 2178-79

5

(2007)(dissenting), pay secrecy is one of the common characteristics of pay discrimination "[p]ay disparities often occur, as they did in Ledbetter's case, in small increments; cause to suspect that discrimination is at work develops only over time. Comparative pay information, moreover, is often hidden from the employee's view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials." CSC's pay secrecy policy was not applied in a gender-neutral manner, but instead was used to attempt to silence a complaint of pay inequity. Recently, in *Tolton v. Jones Day*, 2020 U.S. Dist. LEXIS 87793, at *85-86 (D.D.C. May 19, 2020), the District Court for the District of Columbia, in ruling on a motion to dismiss, recognized that a pay secrecy policy can cause continued disparities by closing natural feedback channels. In this case, CSC had a similar pay secrecy provision, which Noonan's supervisor admitted could discourage employees from discussing pay, and importantly agreed that the policy could encourage an environment of discrimination. JA 931-932. As applied in this case, the policy was used to attempt to quash discussion of pay equity and thus was not gender-neutral. Indeed, the history of pay disparity cases is replete with instances of pay inequity flourishing because of pay secrecy or lack of transparency.[1]

---

[1] See, eg. *Kassman v. KPMG LLP*, 2015 U.S. Dist. LEXIS 118542, at *15-16 (S.D.N.Y. Sep. 4, 2015) granting in part a motion to equitably toll the statute of limitation for certain opt-in Plaintiffs in an equal pay case recognizing that "many women remain unaware that they are victims of wage discrimination and/or lack access to salary data of a male comparator in their organization -- necessary for

CSC acknowledges its pay secrecy provision in illegal under the NLRA. In this case, CSC used an already illegal tool, commonly found in pay discrimination cases, in a manner to silence a complaint of pay discrimination. Nothing about the use of the policy in this case is gender neutral but is instead indicative of an intent to discriminate.

## C. **Defendant's attempt to shame Plaintiff from asking for a raise is directly tied to Defendant's discrimination against Plaintiff.**

CSC argues Petrick's attempt to shame Noonan when she asked for a raise is at most a "stray remark" that is insufficient evidence of an intent to discriminate. Supporting this CSC cites to another case originating in the Western District of Virginia, Lynchburg Division -- *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010) for the proposition that " [i]t is the decision maker's

---

an Equal Pay Act claim." *Citing to* Sarah Lyons, Note, *Why the Law Should Intervene to Disrupt Pay-Secrecy Norms: Analyzing the Lilly Ledbetter Fair Pay Act Through the Lens of Social Norms*, 46 Colum. J.L. & Soc. Probs. 361, 380 (2013) ("Traditional etiquette cautions against discussing salary with co-workers."); *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1014 (11th Cir. 1994)("In March 1989, Meeks inadvertently learned the salaries of her three co-workers."); *Butler v. N.Y. Health & Racquet Club*, 768 F. Supp. 2d 516, 523 (S.D.N.Y. 2011)(" While she was awaiting a pay adjustment, Butler saw a pay rate sheet at an NYHRC site as she was signing in before teaching a class."); *EEOC v. Grinnell Corp*., 881 F. Supp. 406, 408 (S.D. Ind. 1995)("In the Fall of 1991 Caudill saw a check stub of Wesley's and discovered that his salary was significantly higher than hers."); *McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals,* 140 F.3d 288, 296 (1st Cir. 1998)(" Dr. McMillan discovered the disparity between her salary and that of the other department heads at Angell when a newspaper published a letter about the MSPCA that listed the various salaries.").

7

intent that remains crucial, and in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." As this Court has held "statements related to the hiring decision made by an actual decisionmaker are not "stray remarks." *Schafer v. State Dep't of Health & Mental Hygiene*, 359 F. App'x 385, 389 (4th Cir. 2009). In this case, Petrick was one of the decision-makers in establishing Ms. Noonan's salary.  (JA 865, 1352). Her remarks are not stray. Even more so because they are directly tied to the employment decision at hand – happening contemporaneously with the raise request. As this Court recognizes there must be some "nexus . . . between the alleged discriminatory statements and *any* of the employment decisions made by the [employer]." *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548-49 (4th Cir. 1995). Courts in this Circuit have interpreted the above to mean that "[w]hen the statement that the plaintiff offers has a discriminatory nature and is 'related to the employment decision in question,' it is not a stray remark, and it may be direct evidence of discrimination." *Ikome v. CSRA, LLC*, No. PWG-17-3407, 2019 U.S. Dist. LEXIS 120711, at *15 (D. Md. July 19, 2019). A stray remark would be when former CEO William Carrington referred to the women in the marketing department as "girls" in his deposition before quickly correcting himself (JA 1216) and not the direct remark of the Noonan's supervisor made contemporaneously with her request for a raise.

8

D. **The sex of the some of the decision-makers is irrelevant.**

CSC argues because some of the decision makers in this case were women, that creates an inference that the complained of action is not discriminatory. The United States Supreme Court has categorically rejected "any conclusive presumption that an employer will not discriminate against members of his own race." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001 (1998). The Court wrote in *Oncale* that "In *Johnson* v. *Transportation Agency, Santa Clara Cty....***we did not consider it significant** that the supervisor who made that decision was also a man." *Oncale,* at 78-79,(emphasis added).

CSC cites to the *Orgain v. City of Salisbury*, 305 F. App'x 90 (4th Cir. 2008) for the "common sense" notion that members of the same protected class will not discriminate against each other. That case cited a 2007 District Court case from the Eastern District of Pennsylvania for that same proposition which relied upon a 1996 (pre-*Oncale*) case from the 5th Circuit *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 1002 (5th Cir. 1996). This "common sense" notion finds no support in the text of Title VII as Justice Scalia pointed out in *Oncale, supra*. The issue in *Oncale, supra* was a same-sex harassment where the Supreme Court rejected any presumption or inference that the discrimination could not be based upon sex if it came from someone of the same sex, and in that opinion rebuked the Fifth Circuit for the

opposite conclusion. This "common sense" notion is a judicially created doctrine that attempts to import the "common sense" of jurists who do not, in many cases, have the lived experience of those in the protected class. It is also not good law after *Oncale, supra* and courts should stop citing to it.  The appropriate body to apply common sense is the finder of fact, in this case the jury. Additionally, in this case it is factually not true. Women were some of the relevant decision-makers but Petrick testified that the CEO had to approve salaries, the CEO at the time of Wiese and Noonan were hired was Billy Carrington, a male. (JA 865). Additionally, the Petrick email shows that Brad Noble also had some decision making authority over the salary of Noonan in 2018. (JA 1352).

**II.** **Defendant cites to cases that either pre-exist *Burlington* or were actually considering the substantive discrimination claims that are judged by a different standard.**

In analyzing the retaliation claims it is important to note that "whether an action is 'materially adverse' is determined by whether it holds a deterrent prospect of harm, and not by whether the harm comes to pass or whether any effects are felt in the present." *Rattigan v. Holder*, 604 F. Supp. 2d 33, 52-53 (D.D.C. 2009). Also this Court has held that acts of retaliation may be considered together. *Spencer v. Va. State Univ.*, 224 F. Supp. 3d 449, 460 (E.D. Va. 2016).

**A. The threat to fire Noonan is materially adverse under 4th Circuit precedent.**

10

In *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) the United Stated Supreme Court held that Title VII's anti-retaliation provision means "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57 (holding that a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee.). *Burlington,* represented a liberalization of how retaliation claims are judged. Previously the standard used to judge the substantive discrimination claim, whether there was a "tangible employment action" was also used to judge whether there was "material adversity" in the retaliation context. Now these two concepts are divergent and any pre-*Burlington* cases cited must be scrutinized to determine the standard the court applied in that case. Indeed, many post-*Burlington* cases seem not to take cognizance of this sea change and continue to import these pre-*Burlington* concepts. CSC cites to cases from the 5th Circuit and 6th Circuit regarding the threat to terminate, however, in a post-*Burlington* world this Court held in *Maron v. Va. Polytechnic Inst. & State Univ.*, 508 F. App'x 226, 230-31 (4th Cir. 2013) that statements threatening to terminate plaintiff were materially adverse. Additionally, CSC cites to an Eastern District of Virginia case *Harris v. Herring,* 2021 US Dist. LEXIS 6457 for the proposition that "[c]ourts in this circuit have repeatedly held that proposed

termination[s], reprimands, performance improvement plans, and negative performance evaluations do not constitute materially adverse action." When one reads the cases cited to in *Harris* and traces the cases cited in those cases, it is clear that is an incorrect statement. *Harris, supra* cites to two cases for the proposition that a proposed termination is not materially adverse -- *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) and *Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011). *Wonsasue, supra* actually just quotes *Rock supra* – so in reality the "repeated" holdings originate with just one case. In *Rock, supra* the District Court was considering a substantive discrimination claim, writing that "[a]dverse employment actions are not limited to ultimate employment decisions, but rather encompasses any discriminatory act or harassment that *alters the terms, conditions, or benefits of employment*." *Rock, supra at* 470. (emphasis added). The Court concluded in *Rock* that "Plaintiff cites no precedent to support his contention that these actions, aside from his actual termination, in any way negatively affected the terms or conditions of his employment. On the contrary, case law supports Defendant's position that these incidents do not constitute adverse action." *Id*. at 470. Indeed, the cases cited in *Rock* were considering either the substantive discrimination claim (to be judged as to whether it was a tangible employment action) or cite to pre-*Burlington* cases, when retaliation claims were

judged similarly to substantive claims. [2] CSC's brief on this issue reads the facts in the most favorable light to the Defendant, not the Plaintiff. None of the testimony cited by CSC indicates when Petrick allegedly apologized to Noonan. Camm Knight, CEO at the time, was under impression that Melanie addressed the termination threat on behalf of Kristina. JA 721-722.  CSC asserts, without any analysis that it is irrelevant that Christmas was just a co-worker because Noonan knew Petrick was wrong and that some evidence suggests that at some point in time (completely unidentified) Petrick allegedly apologized.  It is relevant that Christmas had no ability to hire or fire Noonan, as a non-decision maker her comments cannot bind the company. Also, *Burlington* is clear that we are to judge from the perspective of a reasonable employee. Here, CSC had an illegal policy of pay secrecy and was discriminating against Noonan, any reasonable employee in that situation has solid reason to doubt her employers ability to follow the law.

### B. The admitted change in Noonan's job responsibilities was materially adverse and related to the protected activity.

CSC argues a reduction in photography duties for the Sr. Photographer is not a material change to Noonan's job. As the Court wrote in *Burlington* "common sense

---

[2] *See Toulan v. DAP Prods., Inc.*, 2007 U.S. Dist. LEXIS 4087, 2007 WL 172522, at *4 (D.Md. Jan. 17, 2007)(considering the substantive claim); *ashv. Abraham*, 437 F.Supp.2d 414, 423 (D.Md. 2006) (cites to the pre-*Burlington* standard for retaliation claims); *Newman v. Giant Food Inc.*, 187 F.Supp.2d 524, 528-29 (D.Md. 2002) (considering the substantive discrimination claim).

suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier **or more agreeable."** *Burlington*, *supra* at 71(emphasis added). Noonan testified she "really enjoyed photography" and it is one of the duties she would keep above many others. JA 315. Petrick's declaration agrees that the reduction in job duties happened in temporal proximity to the undisputed protected activity, agreeing Noonan's photography was reduced after December 2020, but blaming it on poor quality and Covid-19. JA 132. CEO at the time Camm Knight, testified that she was aware of no such plan to reduce photography (JA 695) and had found Noonan to be qualified for her job. JA 698. The review Noonan received just minutes before the protected activity states that Petrick is "excited for even bigger steps in your niche in 2020." JA 868. Noonan's testimony is that the reduced photography came immediately after the protected activity in December 2019 and well before Covid-19 became prevalent in March 2020. JA 1300. Indeed, in March 2020 Noonan emailed Petrick asking why an intern was being assigned photography duties, and Petrick never bothered to respond. JA 440. The above testimony certainly creates an issue of fact as to whether the reduction in photography was materially adverse and related to the protected activity.

14

C. **The failure to give Noonan a reference is directly tied to the instant lawsuit and further evidence of the disparate treatment between Noonan and her male colleague.**

Melanie Christmas, CSC's director of HR, testified she was initially comfortable giving Noonan a reference. JA 662. Christmas then corresponded with CEO Camm Knight where Knight instructed Christmas to keep the recommendation "fact-based." *Id*. Meaning that Noonan "worked at CSC, showed up on time, et cetera." *Id*. Knight agrees the recommendation given to Weise on CSC letterhead was not "fact based" and that the letter would not comply with her directions to Christmas. According to Noonan's testimony after Christmas agreed to do the reference she later called Noonan "one day during her lunch and was almost in tears and said that she couldn't do it. She was told she couldn't." JA 481. Christmas also reported to Noonan at the time that "[s]he had said that people within the company were pressuring her not to do it." *Id*. Christmas subsequently testified she was uncomfortable giving the reference "A: Due to all the information going back and forth to what's going on currently. Q. The lawsuit? A. Yes." JA 662. It is an absolutely fair reading of the evidence that Melanie Christmas was pressured into not giving the reference by CSC while Noonan's male co-worker was once again given favorable treatment. This is behavior that would absolutely dissuade a reasonable person from making a complaint. Wherefore, this matter should be reversed and remanded for trial.

15

Respectfully submitted,
/s/ JOHNEAL M.WHITE
JOHNEAL M.WHITE
GLENN ROBINSON CATHEY MEMMER &
SKAFF, PLC
400 Salem Ave., S.W. Suite 100
Roanoke, Virginia 24016
jwhite@glennrob.com
 (540) 767-2200 – Phone
(540) 767-2220 – Fax

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____      Caption: _____

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

> **Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines.  Appellee's Opening/Response Brief  may not exceed 15,300 words or 1,500 lines.  A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type.  See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

> **Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words.  Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

> **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ ]    this brief or other document contains _____ [*state number of*] words

[ ]    this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[ ]    this brief or other document has been prepared in a proportionally spaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*]; **or**

[ ]    this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s)_____

Party Name_____

Dated:_____